IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **DAWN CECIL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 13-cv-233-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM and ORDER**</u>

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Dawn Cecil, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

<u>**Procedural History**</u>

Ms. Cecil applied for benefits in February, 2010, alleging disability beginning on December 31, 2002.   She later amended her onset date to December 31, 2007, her date last insured for DIB.   (Tr. 14).   After holding an evidentiary hearing, ALJ Rebecca LaRiccia denied the application for benefits in a decision dated November 7, 2011.   (Tr. 14-25).   The Appeals Council denied review, and the decision of the

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 9.

ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ erred in discounting the opinion of her treating doctor (Dr. Wong) because she mistakenly believed that an earlier conflicting opinion was also authored by Dr. Wong.

2.  The ALJ failed to properly assess whether plaintiff met Listing 1.02A by failing to assess whether she was able to ambulate effectively.

3.  The ALJ failed to properly evaluate plaintiff's credibility with regard to her claim that she had a markedly limited ability to stand and walk.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §423(d)(3).**   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Ms. Cecil was, in fact, disabled at the relevant time, but

whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ LaRiccia followed the five-step analytical framework described above. She determined that Ms. Cecil had not been engaged in substantial gainful activity since the alleged onset date.  She found that plaintiff had severe impairments of discogenic and degenerative disc disease, and osteoarthritis of the left knee subsequent to arthroscopic knee surgery.  She further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Cecil had the residual functional capacity (RFC) to

perform work at the light exertional level, with some limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do her past work as assistant manager of a convenience store.   Further, if she were limited to sedentary work, she would be able to do other jobs which exist in significant numbers in the regional economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.   As plaintiff has not raised a claim related to her mental condition, the Court will omit substantial discussion of evidence related only to that subject.

### 1.   Agency Forms

Plaintiff was born in 1963.   She was almost 39 years old on the date she initially alleged as the onset date, December 31, 2002.   (Tr. 145).   She was insured for DIB through December 31, 2007.   (Tr. 146).

Plaintiff said she stopped working on December 31, 2002, because of her condition.   (Tr. 150).   She worked as a manager of a convenience store from 1994 to 2002.   She obtained a GED in 2005.   (Tr. 151).

In March, 2010, Ms. Cecil stated in a Function Report that she was able to be on her feet for about one-half an hour at a time.   She said she did household chores such as dishes, sweeping, mopping, dusting and laundry, but she had to

take breaks.   She went shopping once a week for groceries and household needs. She prepared meals for herself every day.   (Tr. 157-164).

Plaintiff's claim was initially denied on May 27, 2010.   (Tr. 60).

In August, 2010, plaintiff submitted another Function Report.   (Tr. 176-183).   She stated that she could not be on her feet for more than 5 to 10 minutes.   She said she did not do any household chores except for washing dishes if it took less than 5 minutes.   Her mother took care of everything else.   She said that she shopped for groceries every couple of weeks.   She only did the things that she could do sitting down.   Standing and walking were painful, and she had to lie down because she had pain if she sat too long.   She said she would not even try to walk one-half of a block unless she had to.   She was prescribed crutches and a brace for her knee at an emergency room visit in January, 2010.   She used an assistive device "anytime I'm on my feet."   (Tr. 182).

### 2.    Evidentiary Hearing

Ms. Cecil was represented by an attorney at the evidentiary hearing on July 28, 2011.   (Tr. 32).

Counsel asked the ALJ to consider whether the impairments of plaintiff's left knee, cervical spine and lumbar spine, in combination, met or equaled Listing 1.02. Counsel also asked that the alleged date of disability be amended to December 31, 2007.   (Tr. 35).

Plaintiff was 47 years old.   She had been separated from her husband for years, and was staying with her mother.   Her mother and her 24 year old daughter

took care of her.   (Tr. 35-36).

Ms. Cecil last worked in 2002 as the assistant manager of a convenience store.   She testified that she stopped working because her knee "got to be really bad" and her hip hurt.   She testified that she could not work at the time of the hearing because her knee had deteriorated in the last 2 years, her neck hurt, and her back hurt after sitting too long.   (Tr. 37).

Plaintiff had been in prison.   Most recently, she spent 6 months in prison in 2010 because she escaped from work release.   She did not have a job while on work release.   Before that, she was in prison for about 2 and ½ years.   She was assigned work duties while in prison, but was unable to recall what those work duties were.   (Tr. 38-39).

Ms. Cecil testified that she used a cane at the time of the hearing when her knee swelled up.   She was able to walk without a cane.   (Tr. 40).

She was being treated by Dr. Wong.   She tried to see him once a month, but could not always afford it.   He was her mother's boss, and plaintiff testified that "we're all real close friends."   Sometimes plaintiff would have her mother talk to the doctor on the phone for her, or she would "get help over the phone."   Dr. Wong recommended that she see a pain specialist and a knee doctor, but she could not afford it.   Dr. Wong gave her pain medication.   She had just gotten a temporary medical card and was able to get some MRI studies done.   (Tr. 40-41).

On a typical day, she did "not do much of anything."   She watched TV and did crossword puzzles.   Once in a while, she helped her mother with the dishes.

Page **8** of **25**

She testified that her knee "cannot really take any kind of standing at all anymore." (Tr. 43-44).   She could sit for a couple of hours, but then had to lie down for an hour or two to rest her neck.   She was unable to pick up her grandchildren, who were 5 and 2 years old.   (Tr. 47).   Plaintiff testified that she would be unable to do a job where she was mostly sitting all day and could change positions to make herself comfortable because she was unable to sit up all day.   (Tr. 47-48).   She also had pain in her low back, but her neck was worse.   (Tr. 50).

Under questioning from her attorney, Ms. Cecil testified that she was able to walk through her house without her cane, but otherwise she had to use a cane. She had been using a cane for a couple of years, and she testified it was prescribed by Dr. Wong.   Even with the cane, she walked slowly.   (Tr. 48-49).

The ALJ questioned plaintiff about a visit to an emergency room in January, 2011, which indicated she was intoxicated and had drugs in her system.   She testified that she had been at a strip club with her cousin.   A man who was supposed to give her a ride home kidnapped her, drugged her, raped her, stabbed her and left her for dead at a gas station.   The ALJ noted that the record said that she was supposed to be at work.   Plaintiff denied having a job.   (Tr. 45-46).

A vocational expert (VE) testified that Ms. Cecil's past work was semi-skilled and was performed by her at the medium exertional level.   (Tr. 52).   The ALJ asked him to assume a person who could do work at the light exertional level, limited to infrequently stooping, kneeling, crouching, and climbing ramps and stairs.   She could never climb ladders, and should avoid hazards such as

unprotected heights and moving machinery.   The VE testified that this person could do plaintiff's past work as assistant manager of a convenience store as that work is generally performed.   (Tr. 52-53).

The ALJ then asked the VE to add to the hypothetical that the person needed to use a cane for ambulation.   The VE testified that this would eliminate plaintiff's past work.   However, at the light level, this person could do the jobs of counter clerk and office helper.   (Tr. 53).

The ALJ then added an assumption that the person needed the ability to alternate between standing and sitting at will.   The VE testified that this would eliminate the counter clerk and office helper jobs.   However, there were sedentary jobs that this person could do, such as order taker, general office clerk, and receptionist.   (Tr. 53-54).

Lastly, the VE testified that a person who needed to take a 1 to 2 hour break after working for 2 hours would not be able to sustain full-time competitive employment.   (Tr. 54).

### 3.    Medical Treatment

Ms. Cecil had arthroscopic surgery to reconstruct the anterior cruciate ligament in her left knee in April, 1998.   She did not return for any follow-up or rehabilitation program following surgery.   (Tr. 375).

In December, 2002, plaintiff went to the emergency room complaining of pain and swelling in her left knee.   She said that she had been kicked in the knee.   An x-ray showed some fluid and advanced arthritis, but no fractures.   She was given

pain medication and told to ice and elevate her knee.   (Tr. 360-367).

The record reflects no further medical treatment until plaintiff entered the Indiana Department of Corrections.   She arrived at the Department of Corrections in September, 2003.   She had been held at a jail facility before that date. She was serving sentences for driving while intoxicated and forgery.   Her earliest release date was October 26, 2006.   She was to serve two years of work release consecutive to the sentence on the DWI.   (Tr. 595-596).   She had been in jail since February, 2003.   (Tr. 585).

On September 16, 2003, an intake examination was done.   It was noted that she had surgery on her left knee following a vehicular accident in 1998.   She also had back pain due to poor body mechanics and an injury at work.   (Tr. 587).

In October, 2003, plaintiff was working in the prison kitchen washing pots and pans.   (Tr. 546).   She requested Motrin for knee pain because she was on her feet six hours a day at work.   (Tr. 541).   On October 4, 2003, she was seen in the prison infirmary.   Her left knee was swollen.   She was told to "lay in" for a week. (Tr. 510).   On October 20, 2003, she told a psychiatrist that she wanted to work and she "love[d] work."   (Tr. 501).

In November, 2003, she complained that she hurt her back when she fell down the ladder from her bed.   (Tr. 524).   In December, 2003, she requested medical attention for a toothache, (Tr. 515).   Ms. Cecil was seen in the infirmary in February, 2004, after an altercation with another inmate.   She had bruises on her left kneecap and ankle.   She was told to apply ice.   (Tr. 434).

Ms. Cecil was released to probation in June, 2005.   (Tr. 405).

The next medical record is a visit to an emergency room in March, 2009. Plaintiff had fallen off of a roof and landed on her chest.   She was ambulatory with a steady gait.   She had no rib fractures.   The discharge diagnosis was sternal fracture, new versus recurrent.   (Tr. 268-271).

Ms. Cecil was returned to the Department of Corrections in October, 2009, after she absconded from a work release program.   Her earliest release date was January 4, 2010.   (Tr. 482).   A health history form completed on her admission to prison indicated that she had degenerative joint disease in her back, pain in her left knee, and "constant pain in neck" since July of 2009.   She did not have a brace, splint or cane.   (Tr. 396-397).   A Disability Classification form dated October 28, 2009, stated that she had "no disability" and was "capable of performing activities of daily living."   (Tr. 394).

Plaintiff requested a doctor visit in November 11, 2009, for knee pain.   She was issued a universal knee brace.   (Tr. 389).

A Diagnostic and Classification Summary dated December 3, 2009, states that she was last employed as a manager of a convenience store in 2001, "when she quit due to her arrest."   (382).

Plaintiff went to the emergency room for a swollen knee in January, 2010. She had slipped on ice and hyperextended her left knee.   X-rays showed no fracture or subluxation, but there was small joint effusion, severe osteoarthritis and postoperative changes consistent with prior ACL repair.   She was diagnosed with a

sprain of the left knee, unable to rule out ACL injury, and alcohol intoxication.   She was given a knee immobilizer and crutches, and was instructed to follow up with a doctor in 2 to 3 days.   (Tr. 350-359).

Ms. Cecil's next medical treatment was in May, 2010, when she was seen at Community Health and Emergency Services.   That office's records indicate she had been seen in February, 2008, for "alcoholism," but the office note from that visit is not in the record.   (Tr. 295).   She was seen by Physician's Assistant Jessica Frizzell on three visits in May and June, 2010.   On May 6, 2010, plaintiff complained of neck pain that had been present for a year, but had become worse in the past two weeks.   She had not sought medical treatment because she had no health insurance.   On exam, her neck was supple and nontender.   The range of motion of the neck was reduced due to pain.   She had no tenderness to palpation. The assessment was "neck pain."   PA Frizzell recommended stretching exercises and ibuprofen.   She was to return as needed.   (Tr. 289-290).

Adrian Feinerman, M.D., performed a consultative examination on May 17, 2010.   Ms. Cecil told him that her left knee was "fully blown" and she could not put weight on it.   She said her knee "does not stay in the socket."   She also complained of neck pain and arthritic pain in her elbows, knees, hands, back, neck and feet.   She said she did not have a doctor.   On exam, her neck was supple with a full range of motion.   The range of motion of the lumbar spine was also full. Straight leg raising was negative.   There was no anatomic abnormality of the extremities and no warmth, redness, or swelling of any joint.   She had no pain in

the weightbearing joints.   Ambulation was normal without an assistive device. Muscle strength was normal throughout.   Her left calf was atrophied.   The left calf was 1 inch smaller than the right.   She was able to tandem walk, walk on heels and toes, squat and arise, and hop on one leg.   Dr. Feinerman indicated that she did not need an assistive device.   He concluded that she was able to "sit, stand, walk, hear, and speak normally."   In addition, she was able to "lift, carry and handle objects without difficulty."   (Tr. 252-260).

Plaintiff returned to PA Frizzell on June 3, 2010, complaining of neck pain as well as pain in her left knee and low back.   She had gotten a temporary medical card, and wanted to have an MRI done.   Her neck was again supple and nontender, with reduced range of motion.   No objective findings were listed as to her knee or low back.   PA Frizzell ordered MRI studies of her cervical spine and left knee, and prescribed Ultram.   (Tr. 287-288).

MRI of the left knee in June, 2010, showed evidence of previous reconstruction of anterior cruciate ligament with complete disruption of the graft along with degenerative type tears of the medical meniscal body and lateral meniscus.   There was joint effusion with evidence of low-level synovitis.   (Tr. 265-266).

MRI of the neck in June, 2010, showed straightening of the usual cervical lordosis, mild C4-5 canal stenosis, multilevel foraminal stenosis, and extensive C4-5 degenerative disc disease.   (Tr. 267).

On June 30, 2010, PA Frizzell again noted reduced range of motion of the

neck.   She did not note any other objective findings.   She did not yet have the MRI results.   (Tr. 285-286).

Ms. Cecil was seen three times by Dr. Geno Wong, who practiced at Community Health and Emergency Services with PA Frizzell.     On September 21, 2010, plaintiff presented for evaluation and follow up on her chronic knee pain. He noted that she had "reconstructive surgery" on her knee ten years ago.   She said she was filing for disability.   On exam, he noted that her neck was supple and nontender.   Her heart rate was regular and her chest was nontender.   Her lungs were clear.   He noted no abnormal findings except for her complaint of left knee pain.   His plan was "refer to pain clinic."   (Tr. 315-316).   Ms. Cecil returned on October 20, 2010, with "disability paper" to be filled out.   She told Dr. Wong that she had pain in her left knee, neck and back, and that she could not do anything due to pain.   Dr. Wong did not note any abnormal physical findings.   He wrote that she "can do sitting job."   He again suggested a referral to pain management. (Tr. 312-313).

Plaintiff's last visit with Dr. Wong was on January 12, 2011.   She said she was having depression problems.   She had not been to the pain clinic.   She needed paperwork filled out for her SSI application.   He noted that her pain was the same.   Again, he noted no abnormal physical findings.   (Tr. 309-310).

Ms. Cecil was admitted to Southeast Missouri Hospital through the emergency room on January 14, 2011.   She had been found unresponsive on the street.   The next day, she was able to give a history of having been forced to ingest

pills by a stranger, who then raped her, after she accepted a ride home from a strip club.   The diagnoses were toxic encephalopathy secondary to drug and alcohol use, acute respiratory failure, resolved, polysubstance abuse, alcohol abuse and urinary tract infection.   (Tr. 319-320).

On February 11, 2011, after reviewing the discharge summary from the hospital, Dr. Wong wrote "no more narcotics for this patient" in plaintiff's chart. (Tr. 308).

### 4.      RFC Assessment

In October, 2010, a state agency consultant opined that plaintiff could do light work limited to no foot controls with the left leg, only occasional climbing of stairs and ramps, no balancing, and occasional kneeling, crouching and crawling. This doctor reviewed Dr. Feinerman's report and the MRIs of plaintiff's knee and cervical spine in reaching her opinion.   (Tr. 299-306).

### 5.      Opinions of Treating Doctors

PA Frizzell completed a form entitled Medical Evaluation–Physician's Report. Among other questions, this form asks the health care provider to assess the patient's capacity for sustained physical activity in a number of areas by writing in a letter.   The letter A indicates full capacity, B indicates up to 20% reduced capacity, C indicates 20 to 50% reduced capacity, D indicates more than 50% reduced capacity, and E indicates insufficient information.

PA Frizzell completed the form after her June 30, 2010, visit with Ms. Cecil.

She indicated that Ms. Cecil had left knee stiffness and reduced range of motion, as well as reduced range of motion on the neck secondary to pain.   She described the MRI findings.   With regard to ambulation, PA Frizzell checked the box for "normal" as opposed to "assisted."   She rated plaintiff's ability to walk, stand and use public transportation as up to 20% impaired.   She said plaintiff had full capacity to sit. (Tr. 280-284).

Dr. Wong completed a form entitled Medical Source Statement-Physical on June 27, 2011.   The form does not indicate that he had seen her since January, 2011.   He opined that plaintiff could lift and carry less than 5 pounds, stand and/or walk for less than 1 hour total a day, and sit for a total of 1 hour a day.   She was limited to occasional balancing, crouching, crawling, reaching, handling, fingering, and seeing.   She could never climb, stoop or kneel.   She required a cane for ambulation and/or balance.   She needed to lie down or recline every 2 hours to alleviate her symptoms.   (Tr. 598-599).

## Analysis

Plaintiff first argues that the ALJ erred in weighing the medical opinions because she thought that Dr. Wong, and not PA Frizzell, filled out the first report. Plaintiff argues that the ALJ rejected Dr. Wong's June, 2011, opinion largely because it was inconsistent with the first medical report.

Plaintiff's argument is premised on a highly selective reading of the ALJ's decision.   It is true that ALJ LaRiccia incorrectly attributed both opinions to Dr. Wong.   However, her rejection of Dr. Wong's June, 2011, opinion was not

primarily based on her belief that Dr. Wong gave two conflicting opinions.

ALJ LaRiccia rejected Dr. Wong's June, 2011, opinion because his opinion that plaintiff could not sustain an 8 hour workday was not supported by his treatment records.   She noted that he recorded plaintiff's subjective complaints, but his objective findings did not support his opinion that plaintiff was unable to do any work.   She pointed out that his office notes do not document deterioration in her condition since the June 30, 2010, opinion, and that one of his notes stated that plaintiff was able to do a sitting job.   The ALJ wrote that this note was inconsistent with Dr. Wong's opinion that plaintiff needed to lie down every 2 hours and could only sit for 1 hour a day.   (Tr. 22-23).

This Court concludes that the ALJ's weighing of Dr. Wong's opinion is not erroneous.   Notably, a treating doctor's medical opinion is not automatically entitled to controlling weight.   Rather, it is to be afforded controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**

The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." **Books v. Chater, 91 F.3d 972, 979 (7ᵗʰ Cir. 1996)(internal citation omitted).** If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d).[3] In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." **Schaaf v. Astrue, 602 F.3d 869, 875 (7ᵗʰ Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. **Henke v. Astrue, 498 Fed.Appx. 636, 639 (7ᵗʰ Cir. 2012); Schmidt v. Astrue, 496 F.3d 833, 842 (7ᵗʰ Cir. 2007).** If the ALJ determines that a treating doctor's opinion is not

---

[3] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

entitled to controlling weight, she must apply the §404.1527(d) factors to determine what weight to give it.   ***Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010)**. Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax."   ***Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).**

Here, ALJ LaRiccia easily met and exceeded the "minimal articulation" standard.   She rejected Dr. Wong's opinion because it was not substantiated by objective findings, it conflicted with his office notes, it was based largely on plaintiff's subjective complaints, and it was inconsistent with other evidence in the record.   These reasons are sufficient.

Plaintiff's second point is that the ALJ did not adequately discuss whether she met or equaled Listing 1.02A.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.   In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."   20 C.F.R. §404.1525(d).   The claimant bears the burden of proving that she meets or equals a listed impairment.   ***Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).**

The requirements of Listing 1.02A are

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings of appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
  A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02A.

Plaintiff's argument focuses on the ALJ's finding that she did not have "inability to ambulate effectively."   20 C.F.R. pt. 404, subpt. P, app. 1, §1.00B(2)(b) sets forth a rather cumbersome definition of inability to ambulate effectively. Section 1.00B(2)(1) states that "Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."   Section 1.00B(2)(2) goes on to give examples of ineffective ambulation:

the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single handrail.

The ALJ determined that Ms. Cecil did not demonstrate that she was unable to ambulate effectively because she admitted that she could walk around her house without a cane, and there was "no evidence that shows [plaintiff] being unable to independently initiate, sustain, or complete activities, as described in 1.00B(2)(1)."

(Tr. 18).

Plaintiff points out, correctly, that 1.00B(2)(2) states that the ability to walk around the house without a cane "does not, in and of itself, constitute effective ambulation."   However, the regulation does not forbid the ALJ from considering ability to walk around the house unassisted; it simply forbids the ALJ from relying solely on that factor.

While ALJ LaRiccia pointed out that plaintiff admitted that she was able to walk around the house without a cane, she did not rely solely on that factor. Plaintiff takes issue with the ALJ's conclusion that there was no evidence that she was unable to independently initiate, sustain, or complete activities.   Plaintiff's argument is undermined by the fact that she relies mainly on her own statements for evidence that she was unable to perform activities of daily living, and the ALJ found her statements to be less than credible.   Thus, her argument on her second point relies upon the challenge to the credibility findings set forth in her third point.

Plaintiff argues that the ALJ's credibility findings are lacking because she did not specifically discuss the credibility of plaintiff's claim that she could not stand and walk long enough to perform any job.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)**.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting

a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." **Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.** Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." **Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." **Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008).**

ALJ LaRiccia gave specific reasons for her conclusion that plaintiff's allegations were not credible. She pointed out that plaintiff made inconsistent statements during the evidentiary hearing. She worked while she was in prison, which was after the onset date she originally claimed, but testified that she was unable to recall her work duties. The ALJ reasonably questioned the veracity of that testimony. Although medical treatment was available to her in prison, she sought treatment only infrequently, suggesting that her pain was not as severe as

she claimed.   Her testimony at the hearing was inconsistent with the statements she made about her activities in the first Function Report.   And, the second Function Report was inconsistent with the first report, but the medical evidence did not reflect deterioration in her condition.   Lastly, the objective medical findings did not support her claim that she was unable to do work of any kind.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."   ***Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).**   ALJ LaRiccia's analysis is far from patently wrong.   It is evident that she considered the appropriate factors and built the required logical bridge from the evidence to her conclusions about plaintiff's testimony.   ***Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).**

It follows, then, that the ALJ was not required to accept plaintiff's claim that she was unable to ambulate effectively so as to meet or equal Listing 1.02A.   As the ALJ noted, there was evidence in the record to support the proposition that Ms. Cecil was, in fact, able to ambulate effectively.   For instance, the ALJ noted that the June 30, 2010, medical opinion rated her capacity to walk and stand as only 20% reduced.   See, Tr. 22.

The Court is constrained to point out that there is an error in the ALJ's decision in that she found that plaintiff was able to do her past work as a convenience store manager, but the VE testified that a person who needed a cane to ambulate could not do that job.   See, Tr. 52-53.   Plaintiff has not argued that this

error requires remand, no doubt because the error is obviously harmless.   The VE identified three jobs at the sedentary level that could be done by a person with the RFC as found by the ALJ.   This RFC included use of a cane and a sit/stand option. See, Tr. 52-53.   Therefore, the error is harmless and does not require remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

In sum, none of plaintiff's arguments are persuasive.   Even if reasonable minds could differ as to whether Ms. Cecil is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ LaRiccia committed no errors of law, and that her findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Dawn Cecil's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE:   April 11, 2014.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**